**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALEXA MILLER, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 03-4451 (KSH) |
| | : | |
| v. | : | **OPINION** |
| LEVEL 3 COMMUNICATIONS, LLC, | : | |
| and GENUITY, INC | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KATHARINE S. HAYDEN, U.S.D.J.**

Plaintiff Alexa Miller ("Plaintiff") filed this civil action on June 30, 2003 in New Jersey state court against defendants Level 3 Communications, LLC ("defendant"or "Level 3") and Genuity, Inc. ("Genuity"). The case was removed to the District of New Jersey on September 18, 2003 based on diversity jurisdiction. On September 30, 2003, plaintiff voluntarily dismissed defendant Genuity from suit.

The Amended Complaint alleges that Level 3 refused to hire plaintiff because she was pregnant, in violation of the New Jersey Law Against Discrimination ("NJLAD"), the New Jersey Family Leave Act ("NJFLA"), the federal Family and Medical Leave Act ("FMLA"), and other common law theories, including wrongful discharge. Plaintiff added the FMLA claim in her Amended Complaint filed on March 3, 2004. Later, in October, 2004, plaintiff voluntarily dismissed with prejudice the Sixth Count ("Intentional Infliction of Emotional Distress") and the Seventh Count ("Fraud, Deceit, and Misrepresentation"). In November 2004, plaintiff

1

voluntarily dismissed with prejudice the Third Count ("Breach of Contract") and the Fourth

Count ("Breach of the Implied Covenant of Good Faith and Fair Dealing").

Currently before the Court is a motion for summary judgment filed by Level 3. For the

reasons that follow, Level 3's motion is **granted in part** and **denied in part.**

I.      **BACKGROUND**

Plaintiff's Employment at Genuity

Genuity's primary business was to provide enterprise IP networking services to large

customers.  (Rieck Cert. ¶ 4.)   In addition, 4% of Genuity's sales were a product that combined

its network services with managed Internet services.  (Rieck Cert. ¶ 5.)  Plaintiff worked as a

Project Manager in this ancillary business as part of a sales team that sold web hosting

consulting services to new and existing customers.  (Rieck Cert. ¶ 6; Miller Dep. 22-23, 28-29,

38-41.)

Plaintiff worked for Genuity from March 20, 2000 to February 4, 2003.  (Miller Dep. 22,

28-29, 89.)  When she became pregnant, plaintiff planned to start maternity leave on January 31,

2003.  But due to medical complications and to ensure paid maternity leave, plaintiff began her

leave on January 24, 2003.

These timing decisions were unrelated to, but turned out to be affected by, corporate

decisions made by Genuity, which filed for bankruptcy protection in the Southern District of

New York in November, 2002, after experiencing severe business and financial difficulties.

(Stanton Cert., Exh. D.)  By January 31, 2003, rumors of layoffs were circulating in plaintiff's

workplace.  (Miller Dep. 54, 57, 66-68).

Level 3's purchase of Genuity's assets

On February 3, 2003, Level 3 purchased Genuity's assets.  (See Bankruptcy Court Order of January 24, 2003, Hughes Cert., Exh. E.)  Level 3 is a communications and information services company which provides wholesale dial-up service to ISPs in North America and Internet connectivity for broadband subscribers.  (Rieck Cert. ¶ 3.)  Level 3 asserts it sought to expand its core business by acquiring Genuity's enterprise contracts within the network business, Genuity's primary business.  (Rieck Cert. ¶¶ 8, 9.)

Relevant to plaintiff's FMLA cause of action, Level 3 claims it was not conducting any business activities that were similar to Genuity's ancillary web hosting and eServices business, where plaintiff had been working up until her leave.  It claims it considered that the web hosting and eServices business were not profitable, and constituted a "non-core" type of business that was incompatible with Level 3's long-term business model.  (Rieck Cert. ¶ 10.)  However, Level 3 acknowledges that in order to ensure that Genuity's customers would be serviced during the transition period, Level 3 took on the web hosting and eServices business until another business provider could be found.  (Rieck Cert. ¶ 11.)  Level 3 placed the web hosting and eServices business into a separate company called Greenleaf Managed Services, LLC ("Greenleaf"), later renamed Genuity Managed Services, LLC.  (Rieck Cert. ¶ 11.)

Level 3's hiring of Genuity employees

Level 3 hired some of Genuity's employees to assist in the transfer of assets, provide services to customers of Genuity, and ensure a smooth transition period.  (Rieck Cert. ¶ 11; Sharpe Dep. 37.)  These Genuity employees were hired effective February 4, 2003.  (Zwolfer Cert. ¶ 8.)  Michael Sharpe ("Sharpe"), an Operations Service Director at Level 3, was responsible for determining which employees  to hire from Genuity's web hosting and eServices

3

business.  (Sharpe Cert. ¶¶ 1, 2; Sharpe Dep. 10, 23, 25, 33-35.)  Level 3 senior management imposed headcount limitations and looked for individuals that would be present and available during the transition period.  (Sharpe Cert. ¶¶ 3, 5; Sharpe Dep. 33-36, 37-38; Zwolfer Dep. 16, 69.)

Due to time constraints, Level 3 did not conduct personal interviews, review personnel files, or review past performance evaluations.  (Sharpe Cert. ¶¶ 2, 4; Sharpe Dep. 17-20.) Instead, in late January 2003, Level 3 used spread sheets that Genuity provided, which included employees' job titles, location, manager, and ranking compared to other employees, to make its hiring decisions.  (Sharpe Cert. ¶ 4; Sharpe Dep. 17.)  Level 3 maintains that it looked at the role of each Genuity department within Level 3's organization; the accounts being serviced by each department/location; the importance of each account; the number of accounts each employee/ location could service during the transition period; the managerial feedback of each employee; the position/level of each employee; the headcount requirements; the personnel needed during the transition period and on a longer-term basis; and the availability of individuals during the transition period.  (Level 3's Answer to Interrogatory No. 13, Stanton Cert., Exh. C; Sharpe Dep. 11, 22, 25; Zwolfer Dep. 16, 68-69.)

 Rob Zwolfer ("Zwolfer"), a Level 3 Human Resources Manager, prepared the list of names of Genuity employees that were receiving offers from Level 3.  (Zwolfer Dep. 13-15; Gadhok Cert., Exh. M.)  Plaintiff's name was included on the list or "offer list" supplied to plaintiff during discovery.  Level 3 asserts this list was only of "potential offerees."  (Def. Reply Br. at 2-3.)

Plaintiff's alleged offer from Level 3

4

One week after plaintiff went on maternity leave, David Budd ("Budd"), plaintiff's supervisor at Genuity, was contacted by his supervisor, Michael Petty ("Petty"), a Vice President at Genuity. At the time, Budd had been offered a management level position at Level 3.  (Level 3 Communications Offer Access Instruction Letter, Gadhok Cert., Exh. D.)  Petty told  Budd  to contact plaintiff to find out why she had not accepted the offer made by Level 3.  (Budd Dep. 73-74, 88-91.)

Budd contacted plaintiff and told her that Level 3 had offered her a position, and plaintiff orally accepted.  (Miller Dep. at 73-74; Budd Dep. 75-77.)  Budd told her that the offer should be accepted on the Level 3 website and gave plaintiff a login, password information, phone number, and email address.  (Miller Dep. at 74-77; Budd Dep. at 78-80.)  Budd also internally emailed Petty stating that plaintiff had accepted the offer. (Budd Dep. 80-84; Email, Gadhok Cert., Exh. E.)

Plaintiff experienced technical difficulties with the website and contacted Budd  (Budd Dep. 84), who told her to accept the offer via written email and gave her an email address for that purpose.  (Miller Dep. 76.)  Plaintiff sent an email to that email address on January 30, 2005 that stated:

> The following is to inform you that I am unable to access the following site to accept my offer . . .
> . . . I was also invited to attend an offer session but did not receive the information *due to my absence from the office on Maternity Leave.*
> *Please contact me directly ASAP at my home number (973) 243-9525.*

(Email, Gadhok Cert., Exh. G) (emphasis added).

Plaintiff also left a voice message at the Level 3 Resource Center in which she accepted the offer and again gave the information provided in the email.  (Miller Dep. at 75-77).  During this time,

the Level 3 Resource Center was in a temporary office located at Genuity headquarters.
(Chavaria Dep. 24-25; Miller Dep. 75-77.)

Budd testified that later on January 30, 2003, he spoke with Petty, who told him plaintiff
had *not* been extended an offer by Level 3.   Budd was not told why.  (Budd Dep. 88-89.)

On January 31, 2003, Petty contacted plaintiff and informed her that she had not been
hired by Level 3 and the offer had been a mistake.  (Miller Dep. 77-79.)  Thereafter, plaintiff
called Budd for an explanation, but he had none and told her to ask Petty.  (Miller Dep. 79-80.)
Before he got off the phone with plaintiff, Budd warned her to "question everything."  (Miller
Dep. 79-80.)  At the request of Petty, Budd prepared an email on January 31, 2003 documenting
the "Sequence of Events" regarding his contacts with plaintiff.  (Budd Dep. 69-70; Sequence of
Events, Gadhok Cert., Exh. H.)

Plaintiff claims that on February 3, 2003, she was contacted at home by Fermin Chavaria
("Chavaria"), who worked at the Level 3 Resource Center.  (Miller Dep. 82-83.)  According to
plaintiff, Level 3 was not in possession of any Genuity employment files or other material which
would have given the company information about  plaintiff's home telephone number, and that
the only way they could have obtained her home number was by accessing her email and/or
voice mail of January 30, 2003.  (Pl. Oppos. Br. at 5.)  Chavaria told plaintiff he was calling to
inquire whether plaintiff had any questions regarding her offer from Level 3, and plaintif told
him about the developments of January 30 and 31.  (Miller Dep. 82-83.)   Chavaria did not know
that plaintiff had been told no offer had been extended to her and said he would investigate and
call her back, but he never did.  (Miller Dep. 82-83.)

Chavaria testified that he remembers speaking with plaintiff.  He also testified that he

was given a list of Genuity employees who had received offers from Level 3 and it was his job to call and follow up with these individuals.  (Chavaria Dep. 21-22, 27-28, 30-34.)   Chavaria testified that after his conversation with plaintiff, he spoke to Zwolfer, a Level 3 Human Resources Manager, who said that "he would take care of it."  (Chavaria Dep. 27-28, 32-34.)  Zwolfer testified that he remembers talking to Chavaria but does not recall the details of the conversation.  (Zwolfer Dep. 59-61.)

Decision not to hire plaintiff

At some point, the record reflects that Zwolfer informed plaintiff's supervisor Sharpe that plaintiff had commenced an extended leave of absence to last up to three month.  (Sharpe Cert. ¶ 6; Sharpe Dep. 32-33.)  Level 3 argues that Zwolfer told Sharpe about this no later than January 27, 2003, which would have been before any offer was made to her.  (Def. Reply Br. at 1-2.)  Plaintiff contends that based on the testimony of Chavaria, Zwolfer, and Sharpe, the discussion of plaintiff's offer and Sharpe's decision not to make an offer to plaintiff could not have happened before the company's receipt of her written and verbal acceptance of employment with Level 3, which happened on January 30, 2003.  Significantly, in that communication, plaintiff advised Level 3 that she was on a maternity leave and provided her home telephone number, information she claims was not otherwise available to Level 3.  (Pl. Oppos. Br. at 6-7, *citing* Email, Gadhok Cert., Exh. G; Sharpe Cert. ¶ 4; Sharpe Dep. at 19-20.)  Again relevant to the claims in this litigation, it was after the conversation between Sharpe and Zwolfer that Sharpe decided not to hire plaintiff.  (Sharpe Dep. 32–33.)  It is Sharpe's position that he did not know that plaintiff was pregnant or that she was on maternity leave –  that Zwolfer did not tell him the reason that plaintiff was on leave and that he, Sharpe, did not learn

7

about the basis for the leave through any other source.  (Sharpe Cert. ¶ ¶ 6 and 8; Sharpe Dep. 29, 32; Carraway Cert. ¶ 7.)   According to Sharpe, since the purpose of hiring Genuity employees was to service the customers during the transition period and assist in the transition, it decided not to hire plaintiff because she was not available to work during this critical period. (Sharpe Cert. ¶ 7; Sharpe Dep. 32-39.)

Level 3 points out that Budd's conversation with plaintiff occurred before the closing date and at a time that  Budd and Petty were still employees of Genuity, not Level 3.  Moreover, Petty was never hired by Level 3;  Budd was hired but 8 weeks later he was laid off.  (Budd Dep. 21, 2.)  In addition, Level 3 maintains that it hired other Genuity employees who were on pregnancy-related leave.  In particular, Level 3 points to Sharpe's hiring of a Krista McFarland, a woman he knew was on pregnancy leave at the time of the selection process but scheduled to return to work shortly after the transition period began.  (Sharpe Dep. 29-31.)

Plaintiff argues that every Genuity employee who was recommended for employment as a Project Manager was hired, except for her.  (Genuity Employee Ranking Lists, Exh. N; Defendant's Response to Requests for Admission, No. 32, 36, 38, Gadhok Cert., 39, Exh. O.)  In addition, all of plaintiff's colleagues in her department were hired and none of these individuals were pregnant.  (Budd Dep. at 110.)  In total, Level 3 hired approximately 1500 Genuity employees.  (Former Genuity Employees Hired by Level 3, Gadhok Cert, Exh. P.)

Plaintiff contends that on March 6, 2003, she received a call from the human resources office asking why she had not yet signed a General Release.  (Miller Dep. 85.)  After stating that she would not sign the release, plaintiff was told her medical benefits were terminated as of February 4, 2003, one week before her baby was born.  (Miller Dep. 88-90, 123-25.)

Level 3's sale of the ancillary business

By March of 2003, Level 3 had decided to shut down the web hosting and eServices business.  Level 3 contacted Computer Sciences Corporation ("CSC") to determine whether it would be willing to include its name in a press release as a contact for its customers.  CSC said it would take on all the contracts and customers of the web hosting and eServices business while continuing to use Level 3 for the networking services component of the information technology packages that CSC provided to the customers acquired from Level 3.  (Rieck Cert. ¶¶ 12-14.)  In April 2003, Level 3 sold the web hosting and eServices contracts to CSC for a nominal sum. (Rieck Cert. ¶ 13.)

Although CSC is an independent, publicly-traded company, plaintiff argues that the relationship between Level 3 and CSC is one of contractor/subcontractor.  (Rieck Cert. ¶ 13; Perez Dep. 27-28.)  Plaintiff also contends that CSC enjoys certain direct access privileges to Level 3 services not available to other customers.  (Perez Dep. at 38.)  And although many of the employees hired from Genuity were laid off  (Zwolfer Cert. ¶ 8), plaintiff maintains many of them were offered positions with entities doing business with Level 3, including CSC.[1]  (Pl. Oppos. Br. at 8.)  Level 3 states that CSC hired approximately 125 of the 260 former Genuity employees who had worked in the web hosting and eServices business through Greenleaf. (Rieck Cert. ¶ 14.)  According to Level 3, CSC had different offices, different facilities, and a different senior management team than Genuity and Greenleaf.  (Rieck Cert. ¶ 15.)

Plaintiff remains unemployed to date.  (Miller Dep. 13-14, 56-57, 98-99.)

_____

[1] Plaintiff refers to one employee, Joseph Perez, who was offered a job with CSC.  Perez testified that his job requirements and responsibilities remained the same with Level 3 and CSC and he was able to work from home.  (Perez Dep. at 12-14, 28-30.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact" such that she is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute will not defeat a summary judgment motion unless the dispute is both genuine and material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  At the summary judgment stage, the Court's "function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In so doing, the Court must construe the facts and all inferences that reasonably could be drawn therefrom in a light most favorable to the non-moving party.  Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002).

## III.   DISCUSSION

Since this is a motion for summary judgment, the Court will examine the record in the light most favorable to plaintiff.

### NJLAD

In Count 1, plaintiff alleges that Level 3 refused to hire her because she was pregnant, in violation of NJLAD.  Claims brought pursuant to the NJLAD are analyzed under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework.  See Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 595 (1988).  To prevail, plaintiff must prove (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) action occurred under circumstances giving rise to an inference of discrimination.  Jones v. School District of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999).  Level 3 must then "articulate some legitimate, nondiscriminatory reason for the

employee's rejection."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994.)  If Level 3 satisfies

this burden, plaintiff must then show by a preponderance of the evidence that Level 3's

explanation is pretextual.  Id.

As the foregoing facts demonstrate, there is a genuine dispute as to whether Level 3 knew

plaintiff was pregnant when it decided not to hire her.  It is also in dispute whether plaintiff was

made an offer, whether the offer was revoked, and whether plaintiff accepted an offer from

Level 3.   These are crucial predicate facts to any examination of whether plaintiff has met her

burden under the McDonnell Douglas test.  As such, scrutinizing the record further will not be

useful, because these basic, material facts are in dispute, precluding summary judgment on

Count 1 of the Complaint.

**FMLA & NJFLA**

Plaintiff alleges that Level 3's decision not to hire her is in violation of the NJFLA and

FMLA.  Level 3 argues that summary judgment should be granted in its favor on Counts 2 and 8

of the Complaint because plaintiff is not eligible for FMLA and NJFLA protection.

Under the FMLA, plaintiff is an "eligible employee" if she was employed "for at least 12

months by the employer with respect to whom leave is requested" and "for at least 1,250 hours

of service with such employer during the previous 12-month period." § 2611(2)(A)(i),(ii).  The

FMLA provides that the term "employer" includes "any successor in interest of an employer."  §

2611(4)(A)(ii)(II).  If Level 3 is a successor to Genuity under this subsection then plaintiff's

entitlement to FMLA leave would have been the same as if her employment by Genuity and

Level 3 were "continuous employment by a single employer."  29 C.F.R. § 825.107(c).  Level 3

would be required to count plaintiff's hours of employment at Genuity for purposes of

11

determining plaintiff's FMLA leave eligibility. Id.  Therefore, the issue that must be decided relative to Level 3's motion does not relate to its interactions with plaintiff, but rather its relation to Genuity, plaintiff's prior employer, because if Level 3 is a successor in interest to Genuity, then plaintiff becomes an "eligible employee" for purposes of the FMLA.

Although "successor in interest" is not defined in the statute, the Secretary of Labor has provided eight non-exhaustive factors for evaluating whether an employer qualifies as a successor in interest for purposes of the Act:[2]

(1) Substantial continuity of the same business operations;

(2) Use of the same plant;

(3) Continuity of the work force;

(4) Similarity of jobs and working conditions;

(5) Similarity of supervisory personnel;

(6) Similarity in machinery, equipment, and production methods;

(7) Similarity of products or services; and

(8) The ability of the predecessor to provide relief.

29 C.F.R. § 825.107(a).

The regulation further provides that "[a] determination of whether or not a 'successor in interest' exists is not determined by the application of any single criterion, but rather the entire circumstances are to be viewed in their totality." § 825.107(b).  Although these regulatory factors may not be binding on the Court, they are regulatory-level guidance and this District has followed them in the past.  See Vanderhoof v. Life Extension Inst., 988 F. Supp. 507 (D.N.J. 1997); Rhoads v. F.D.I.C., 956 F. Supp. 1239 (D. Md. 1997), Jolliffe v. Mitchell, 971 F. Supp.

---

[2] The FMLA directs the Secretary of Labor to issue such regulations as are necessary to carry out its provisions, see 29 U.S.C. § 2654, and such regulations have been promulgated at 29 C.F.R. § 825.

1039 (W.D. Va. 1997) (applying the regulations to determine whether the plaintiff was an "eligible employee").

Plaintiff argues that Level 3 is a successor in interest to Genuity for FMLA purposes because Level 3 consisted of many of the same employees, conducted the same business operations, dealt with the same clients, employed common supervisors, and provided the same services, as Genuity, all factors reflected in the regulations.

The Court finds that Level 3 took on Genuity's web hosting and eServices business when it bought the assets of Genuity out of bankruptcy. In fact, Level 3 eventually renamed the business Genuity Managed Services, LLC. Level 3 hired approximately 1,500 Genuity employees to assist in the transfer of assets, provide services to customers of Genuity, and ensure a smooth transition period and sense of continuity to Genuity's clients. The essence of a "smooth transition" is continuity, the first of the regulations factors.

The decision to take on the ancillary business of Genuity was a business decision that favored Level 3 and its desire to provide clients with continuity. The record indicates the intent of Level 3 was to service existing clients with a reasonable facsimile to plaintiff's group. As such, the employees hired from Genuity's ancillary business continued to sell web hosting consulting services to Genuity's customers.

Even though Level 3 eventually fazed out the ancillary business, Level 3 originally took on its services. Level 3 benefitted and sought to benefit from continuing the business practices and products of the company it bought out of bankruptcy. Level 3 seeks the advantage of taking on the ancillary business for a "smooth transition" without the downside of related employee benefits.

13

Applying the successor factors, and considering them not in isolation but under a totality test, as directed by § 825.107(b), the Court finds that Level 3 is a successor in interest and as a consequence, Level 3's arguments based on its relation to Genuity, or lack thereof, may not defeat the FMLA claim.

Level 3 makes two other arguments that the Court does not find persuasive.  The FMLA provides that "eligible employee" does not include, an "employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." § 2611(2)(B).   Level 3 uses this exclusion by maintaining that plaintiff has not demonstrated that Genuity employed 50 or more individuals within a 75 mile radius of where plaintiff worked in New York City.   Level 3 relies solely on the deposition of Budd and Perez for the proposition that Genuity employed only 7 or 8 employees in the Greater New York area. (Def. Moving Br. at 34, *citing* Budd Dep. 27; Perez Dep. 36.)  However, deposition testimony confirms there were approximately 7 or 8 employees working under Budd's management, but does not establish that the *total* number of individuals employed by Genuity in the New York and New Jersey offices was less than 50.

Level 3's main predicate for seeking summary judgment as a matter of law is an Order entered in the Bankruptcy Court that expressly declares that Level 3 and its affiliates are not successors of Genuity.  (See Bankruptcy Court Order of January 24, 2003, Hughes Cert., Exh. E.)  The Court disagrees that the Bankruptcy Order is dispositive as to whether Level 3 is a successor in interest to Genuity for purposes of FMLA eligibility.  "Federal statutory mandates such as the FMLA are not a 'liability' that is assumed or not assumed in a sales transaction."

14

Carlson v. Rent-A-Center, Inc., 237 F. Supp. 2d 114, 126 (D. Me. 2002).  To conclude otherwise would be to circumvent the reason for placing the successor in interest language in the FMLA: to protect employees when the company they are working for is purchased by another company.

See Barrilleaux v. Thayer Lodging Group, Inc., No. 97-3252, 1999 U.S. Dist. LEXIS 8206, *12 n.8 (May 25, 1999).  Bankruptcy Orders issued to permit asset purchases in the face of claims of merger are a commonplace in bankruptcy actions.  In that context, the law is not clear as to the extent of what "property" of a debtor's estate may be sold free and clear of "interests," nor is the law clear as to the extent of how broadly the term "interest" should be defined.  More to illustrate this point than to deal substantively with an issue that is not central to the ones to be resolved in this motion, the Court cites to the following passage in Collier's:

> The term "interest" is not defined by the Code, and there is some debate as to how broadly the concept should be interpreted. The importance if this issue is such that the court's interpretation of "interest" will determine exactly what section 363 strips from sold assets. On one end of the spectrum, there is little doubt that "interest" encompasses liens against the property.  Some courts have held that a sale under section 363 can free the sold assets of a lessee's possessory interest. Section 363(f) has also been interpreted to include certain unsecured claims in particular situations, including pension obligations under the Coal Act, an obligation to honor a seller/debtor's travel voucher program, and claims for a debtor/seller's potential violations of the Equal Employment Opportunity Act. On the other hand, the law is less clear with respect to whether section 363 will shave off future liabilities of the seller from the assets such that the purchaser will be spared from successor liability for the debtor's presale actions.

1-24A COLLIER TRUSTEES & DEBTORS IN POSSESSION P 24A.12 (2004) (footnotes omitted).

This thoughtful analysis demonstrates why it is inappropriate for Level 3 to rely on the existence of the Bankruptcy Order as disposing of the issue in its favor.  In the absence of any controlling authority otherwise, and guided by the district court decisions and the treatise above cited, the Court finds that the Bankruptcy Order may not defeat application of the eight factors set forth by the Secretary of Labor.  And once the factors are applied, taken in their totality, they

outweigh any effect of the Bankruptcy Order.

The Court finds that Level 3 has not demonstrated as a matter of law that plaintiff is ineligible for FMLA protection and denies its motion for summary judgment on Count 8.

Unlike its federal counterpart, NJFLA does not contain the specific "successor in interest" language.  Plaintiff fails to respond to Level 3's argument that "[t]o be an eligible employee under the NJFLA, the individual must have been employed by the same employer for at least 12 months, and for at least 1000 base hours during the 12-month period immediately preceding the leave.  N.J.S.A. 34:11B-3(e); N.J.A.C. 13:14-1.2.  Plaintiff never worked for Level 3, and so cannot meet the length of service or hours requirements of the law."  (Def. Moving Br. at 35.)  Plaintiff instead argues that the NJFLA and FMLA are "substantially similar."  (Pl. Oppos. Br. at 32.)  This misses the point that it is undisputed that plaintiff did not work for Level 3 for at least 12 months and for at least 1000 base hours during the 12-month period immediately preceding the leave, and plaintiff has supplied no authority that would apply the NJFLA to plaintiff under these circumstances.  Accordingly, summary judgment is granted in favor of Level 3 on Count 2 of the Complaint.

## **Wrongful discharge**

Plaintiff alleges that Level 3's decision not to hire her constitutes wrongful discharge. Level 3 argues, and this Court agrees, that plaintiff's claim of wrongful discharge is preempted by her NJLAD claim, NJFLA, and FMLA claims.

As articulated in Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 492 (App. Div. 1994), supplementary common law causes of action may not go to the jury when a statutory remedy exists under LAD.  The court reasoned that  a common law claim for discrimination was

16

unnecessary as the NJLAD should be read broadly enough to encompass those claims and damages previously available at common law.  Id.  In DeJoy v. Comcast Communications, Inc., 941 F. Supp. 468, 476 (D.N.J. 1996), the district court found plaintiff's common law claim was preempted by NJLAD because plaintiff provided no information demonstrating his common law claim was "different or broader" than his NJLAD claim.  In addition, in Mardini v. Viking Freight, Inc., 92 F. Supp. 2d 378, 382-85 (D.N.J. 1999), the district court dismissed a wrongful termination claim because it involved the same elements as a NJLAD claim.

Plaintiff relies on Mosley v. Bay Ship Management, Inc., 174 F. Supp. 2d 192 (D.N.J. 2000) to argue that NJLAD does not preempt plaintiff's wrongful discharge claim.  But that case examined  common law claims for breach of contract and tortious interference, not a common law claim for wrongful discharge.  It did not disturb the reasoning of the cases in this district described above.

Plaintiff provides no information showing her common law claim of wrongful discharge is different or broader than the her various statutory claims.  Evidence of the redundancy of plaintiff's wrongful discharge claim is found in Count V of the Amended Complaint where plaintiff states:

> 29.    Plaintiff repeats the allegations of the First, Second, Third, and Fourth Counts as though fully set forth herein.
> 30.    The acts and omissions of Defendant Level 3 and Defendant Genuity constitute a wrongful discharge by which Plaintiff has been damaged and will continue to suffer damages.

(Amended Compl. ¶¶ 29, 30.)

In Count V, plaintiff is seeking recovery for "wrongful discharge" for the same alleged wrongs for which she seeks recovery under Federal and State statutes.  As such, the decisions above amply support dismissal of the common law claim on grounds that it is preempted by NJLAD. .

17

**IV.     CONCLUSION**

For the foregoing reasons, the Court **denies** summary judgment with respect to plaintiff's

NJLAD and FMLA claims, and **grants** summary judgment on behalf of Level 3 with respect to

plaintiff's common law wrongful discharge and NJFLA claims.

Dated: June 29, 2005                                     s/ Katharine S. Hayden

                                                         Katharine S. Hayden, U.S.D.J.

18